**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY, AND ALLSTATE NEW
JERSEY INSURANCE COMPANY,

Plaintiffs,

AMNER KHAIMOV, ZOYA AMINOVA,
MURDAKHAY KHAIMOV, ALBERT KHAIMOV,
YAKOV AMINOV, ILYA TAMAYEFF, ABRAHAM
LAYLIEV, ROBERT TERDJANIAN, GALINA VOVK,
A/K/A VALENTINA BABUCEA, VLADISLAV
AGUVAYEV, OLEG SIMAKOV, SERGEY MEZKULA,
GRIGOL APRESYANTSI, MARIFAT
DAVLATKHONOVA, MICHAEL ZAVRAZHIN,
LAPERLA SUPPLY, INC., F/K/A NEW MILLENNIUM
SUPPLY, INC., PARSONS MEDICAL SUPPLY, INC.,
JAMAICA MEDICAL SUPPLY, INC., QUEENS
MEDICAL SUPPLY, INC., GRAND MEDICAL
SUPPLY, INC., ROYAL MEDICAL SUPPLY, INC.,
UTOPIA EQUIPMENT, INC., GNK MEDICAL
SUPPLY, INC., HIGHLAWN BEST MEDICAL
SUPPLY, INC., NEW CAPITAL SUPPLY, INC., AVR
MEDICAL SUPPLY, INC., FRAZIER TRADING CO.,
INC., A TO Z WHOLESALE, INC., BULLS EYE
WHOLESALE, INC., E-Z SUPPLY, INC., GLOBAL
BEST DEAL, INC., GRIGOL SUPPLY, INC., HONO
OFFICE SUPPLY, INC., MEDCURE SUPPLIES, INC.,
TELYA CORP., MAJOR MARKET MERCHANDISE,
INC., VZ GROUP, INC., JOHN DOES 1 THROUGH 20
AND ABC CORPORATIONS 1 THROUGH 20,

Defendants.

-----------------------------------------------------------------X

CIVIL ACTION NO. _____

**CV11-2391**

COMPLAINT

(TRIAL BY JURY DEMANDED)

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAY 18 2011 ★

BROOKLYN OFFICE

GLEESON, J.

AZRACK, M.J.

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property &

Casualty Insurance Company, and Allstate New Jersey Insurance Company (collectively

"Plaintiffs"), by their attorneys, Stern & Montana, LLP, for their Complaint against Defendants

Amner Khaimov ("A. Khaimov"), Zoya Aminova ("Aminova"),  Murdakhay Khaimov ("M.

Khaimov"),  Albert Khaimov ("Khaimov"), Yakov Aminov ("Aminov"),  Ilya Tamayeff

("Tamayeff"), Abraham Layliev ("Layliev"), Robert Terdjanian ("Terdjanian"), Galina Vovk, a/k/a Valentina Babucea ("Vovk"), Vladislav Aguvayev ("Aguvayev"), Oleg Simakov ("Simakov"), Sergey Mezkula ("Mezkula"), Grigol Apresyantsi ("Apresyantsi"), Marifat Davlatkhonova ("Davlatkhonova"), Michael Zavrazhin ("Zavrazhin"), LaPerla Supply, Inc., f/k/a New Millennium Supply, Inc. ("LaPerla Supply"), Parsons Medical Supply, Inc. ("Parsons Medical Supply"), Jamaica Medical Supply, Inc. ("Jamaica Medical Supply"), Queens Medical Supply, Inc. ("Queens Medical Supply"), Grand Medical Supply, Inc. ("Grand Medical Supply"), Royal Medical Supply, Inc. ("Royal Medical Supply"), Utopia Equipment, Inc. ("Utopia Equipment"), GNK Medical Supply, Inc. ("GNK Medical Supply"), Highlawn Best Medical Supply, Inc. ("Highlawn Best Medical Supply"), New Capital Supply, Inc. ("New Capital Supply"), AVR Medical Supply, Inc. ("AVR Medical Supply"), Frazier Trading Co., Inc. ("Frazier Trading"), A to Z Wholesale, Inc. ("A to Z Wholesale"), Bulls Eye Wholesale, Inc. ("Bulls Eye Wholesale"), E-Z Supply, Inc. ("E-Z Supply"), Global Best Deal, Inc. ("Global Best Deal"), Grigol Supply, Inc. ("Grigol Supply"), Hono Office Supply, Inc. ("Hono Office Supply"), MedCure Supplies, Inc. ("MedCure Supplies"), Telya Corp. ("Telya"), Major Market Merchandise, Inc. ("Major Market Merchandise"), VZ Group, Inc. ("VZ Group"), John Does 1 through 20 and ABC Corporations 1 through 20 (collectively "Defendants"), allege as follows:

### PRELIMINARY STATEMENT

1.      On information and belief, beginning in or about June 2003, through the date of the filing of this Complaint, Defendants engaged in a massive scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $2,100,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for

durable medical equipment and supplies ("DME") and/or orthotic devices, including but not limited to cervical pillows, cervical traction units, cold/hot water circulating pumps, electronic muscle stimulator units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, cervical collars and ankle, back, knee, shoulder and wrist braces.

3.      At all relevant times mentioned herein, each and every DME and/or orthotic device was provided pursuant to a predetermined course of treatment, irrespective of medical necessity and/or need, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, defined below.

4.      At all relevant times mentioned herein, each of the enterprises alleged herein operated in a fundamentally identical manner.  For instance, on information and belief, to execute their scheme to defraud, Defendants Amner Khaimov, Zoya Aminova, Murdakhay Khaimov, Albert Khaimov, Yakov Aminov, Ilya Tamayeff, Abraham Layliev, Robert Terdjanian, Galina Vovk a/k/a Valentina Babucea (when not referred to individually, referred to collectively herein as the "Retail Owners"), through one or more of the retail medical supply companies, which include Defendants Royal Medical Supply, Grand Medical Supply, Utopia Equipment, Jamaica Medical Supply, Queens Medical Supply, LaPerla Supply, New Capital Supply, Parsons Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, AVR Medical Supply (collectively the "Retailers") entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bill No-fault insurers for medical services (hereinafter "No-fault Clinics") and one or more wholesale medical supply companies and their owners, which include Defendants Frazier Trading Co., Inc., A to Z Wholesale, Inc., Bulls Eye Wholesale, Inc., E-Z Supply, Inc., Global Best Deal, Inc., Grigol Supply, Inc., Hono Office Supply, Inc., MedCure Supplies, Inc., Telya Corp., Major Market Merchandise, Inc., VZ

Group, Inc., ABC Corporations 1 through 20 (collectively the "Wholesalers"), Vladislav Aguvayev, Oleg Simakov, Sergey Mezkula, Grigol Apresyantsi, Marifat Davlatkhonova, Michael Zavrazhin and John Does 1 through 20 (collectively the "Wholesale Owners") (When not referred to individually, the Wholesalers and Wholesale Owners are collectively referred to as the "Wholesale Defendants").

5.    On information and belief, pursuant to these agreements and in exchange for kickbacks and/or other financial compensation, the No-fault Clinics, which are not named as defendants in this action, ensured that (1) their associated doctors and/or chiropractors prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment, irrespective of medical necessity; and (2) the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.    On information and belief, in exchange for kickbacks and/or other financial compensation, irrespective of the purported complaints of pain or type of injury documented in connection with a particular claim, the No-fault Clinics, through their associated doctors and/or chiropractors, supplied prescriptions pursuant to a predetermined course of treatment, with the prescribed items being dictated by the Retailers. Even patients who should never be prescribed certain DME and/or orthotic devices due to the existence of a serious medical condition were prescribed items pursuant to a standard protocol of treatment that potentially compromised their health. By way of example and not limitation, in connection with claim 0181193426, a No-fault Clinic operating in Queens County prescribed an Electronic Muscle Stimulation ("EMS") Unit to a No-fault Claimant with a documented history of heart failure and an implanted defribillator. On information and belief, an EMS Unit operates by delivering tiny electrical impulses to

4

stimulate muscles and is not recommended for use by, among others, people fitted with pacemakers and internal defribillators. Notwithstanding the foregoing, pursuant to its kickback and/or other financial compensation agreement with one or more of the Retailers, the No-fault Clinic prescribed a DME item (the EMS Unit), without any regard to medical necessity, based on a predetermined course of treatment, and in doing so, potentially compromised the health of a No-fault Claimant.

7. On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including but not limited to a share in the profits of the scheme to defraud, the Wholesale Defendants provided the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices which grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet identifying, to the extent known, the Wholesalers that provided the Retailers with inflated invoices.

8. On information and belief, it was the usual and customary course of business for prices reflected on wholesale invoices to be grossly inflated for DME and/or orthotic devices. In fact, the wholesale invoices provided typically reflected prices that are up to 10 to 20 times the actual prices that Retailers pay to the Wholesale Defendants. In addition, oftentimes, the Retailers never actually purchased DME and/or orthotic devices, but the Wholesale Defendants provided the Retailers with invoices to create the illusion of a sale.

9. On information and belief, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, the Retailers issued checks to the Wholesale Defendants, and other

purported wholesalers, for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false wholesale invoice amounts. In reality, on information and belief, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned to the Retailers up to approximately 90% of the wholesale invoice amounts. On information and belief, these covert cash transactions were facilitated through various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers and check cashers.

10.    On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which would in turn be used, for among other things, to pay kickbacks to the No-fault Clinics, from which they purchased prescriptions for DME and/or orthotic devices.

11.    On information and belief, after obtaining the prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants, the Retail Owners, through their respective Retailers, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for, and the quality of, the DME and/or orthotic devices purportedly provided.

12.    On information and belief, at all times relevant herein, the documents submitted by the Retail Owners, through their respective Retailers, to Plaintiffs in support of their fraudulent claims, including the wholesale invoices, deliberately omitted basic information about the DME and/or orthotic devices, i.e., the manufacturer, make, model, size, features or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

13.    On information and belief, the wholesale invoices were deliberately vague and

non-descript to conceal the actual make, model, type or quality of the DME and/or orthotic device purportedly provided to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device billed was medically necessary.

14.    On information and belief, the Retail Owners, through their respective Retailers, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants, but submitted documents, including, but not limited to, inflated wholesale invoices that failed to correctly reflect the actual purchase price of each item.

15.    On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retailer Owners, through their respective Retailers, generated "delivery receipts" which included a space for No-fault claimants to sign in order to confirm receipt of each item for which the Retail Owners, through their respective Retailers, billed Plaintiffs.

16.    On information and belief, the Retailers, working with the No-fault Clinics that prescribed the DME and/or orthotic devices, arranged for the No-fault Claimants to sign the delivery receipts in blank thereby allowing the Retail Owners, through their respective Retailers, to fill in the delivery receipt with whatever DME and/or orthotic devices that the Retailers wanted to bill without the No-fault Claimant's actual confirmation that they received the items identified therein.   In other instances, where the No-fault Claimant did not sign the delivery receipt, the Retailers, working with the No-fault Clinics, arranged for the No-fault Claimant's signature to be forged on the delivery receipt, thereby falsely representing that the No-fault Claimant acknowledged receipt of the billed for DME and/or orthotic devices.

17.    On information and belief, in these and other ways, Defendants' interrelated

schemes to defraud operated in a fundamentally similar manner. By way of further example and not limitation of Defendants' near identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including but not limited to, delivery receipt and substantially similar assignment of benefit forms, containing the same typos, misspelling and stray marks. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing identical delivery receipt and/or assignment of benefit forms that were obviously based on a shared template.

18.     On information and belief, in carrying out their scheme to defraud, Defendants stole millions of dollars from Plaintiffs by submitting, or causing to be submitted, fraudulent claims for persons who allegedly sustained injuries covered by the New York Comprehensive Motor Vehicle reparations Act (popularly known as the "No-fault Law"). Under that law, policyholders and others who sustain injuries in automobile accidents (hereinafter "No-fault Claimants" or "Claimants") can obtain payments from the policyholder's automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the No-fault Claimant's physicians. Claimants can also assign those benefits to doctors and other properly licensed healthcare providers, enabling them to bill insurance companies directly for their services. Defendants exploited that system by obtaining such assignments and billing insurers for DME and/or orthotic devices that were never provided, or not provided as billed or if provided, were of inferior quality relative to what was represented in the bills submitted to Plaintiffs to have been provided and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices.

## STATUTORY/REGULATORY SCHEME

19.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules adopted by the Superintendent of Insurance.

20.     Pursuant to 11 N.Y.C.R.R. § 65-3, payment for medical expenses must be in accordance with fee schedules promulgated under Section 5108 of the Insurance Law.

21.     Effective October 6, 2004, the Department of Insurance, through the Superintendent's promulgation and amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment (the "Fee Schedule"), medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances.

22.     The Amendment to Regulation 83, which was in effect at all relevant times mentioned herein, provides:

>          the "maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public."

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F).

23. Pursuant to Section 5108 (c) of the No-fault Law, "no provider of health services … may demand or request any payment in addition to the charges authorized pursuant to this section."

24. Pursuant to the No-fault Law and its implementing regulations, providers of DME are entitled to reimbursement in amounts set forth in the Fee Schedule. In instances where an item of DME is not set forth in the Fee Schedule, and therefore, there is no established fee schedule, the provider is entitled to reimbursement in an amount equal to the lesser of the acquisition cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F).

25. At all relevant times mentioned herein, nearly each and every bill mailed by the Retail Owners, through their respective Retailers, to Plaintiffs for reimbursement misrepresented the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic device. In particular, on information and belief, the Retailers, as a matter of pattern and practice, submitted bills to Plaintiffs that materially misrepresented the DME and/or orthotic devices for which they were seeking reimbursement. For instance, the Retailers sought reimbursement from Plaintiffs in exorbitant amounts for complex, expensive DME and/or orthotic devices that they never actually provided. To the extent the DME was provided at all, each item was a basic, low-quality piece of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of need.

26. As more fully alleged in the "Fee Schedule Scheme to Defraud" section below, at

all relevant times mentioned herein, the Retail Owners, through their respective Retailers, as a matter of pattern and practice, fraudulently submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided, or if provided, did not correspond with the code descriptions in the Fee Schedule for which they sought reimbursement. In that regard, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs seeking reimbursement under codes which had significantly higher reimbursement rates than the codes for the items they actually supplied (hereinafter referred to as "upcoding") and, as a result, the Retail Owners, through the Retailers, were paid substantial sums by Plaintiffs far in excess of the amounts they were otherwise entitled to receive under the No-fault Law. By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims Plaintiffs paid to the Retailers where the DME and/or orthotic devices were never provided, or if provided, were upcoded so that the code descriptions failed to correspond with the DME and/or orthotic devices purportedly provided.

27.    In addition to fraudulently upcoding bills for the DME and/or orthotic devices actually provided, the Retail Owners, through their respective Retailers, also perpetrated their massive scheme to defraud by submitting bills to Plaintiffs wherein they misrepresented that certain DME were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing phantom codes for which there was no published fee schedule.

28.    By submitting bills to Plaintiffs which contained phantom codes not recognized under the relevant Fee Schedule in existence at the time or that materially misrepresented the nature, quality and cost of the DME and/or orthotic device, the Retail Owners, through their respective Retailers, deliberately misrepresented the amounts they were entitled to receive under the No-fault Law.

29.     Separate and apart from submitting bills that materially misrepresented the DME and/or orthotic devices purportedly provided, in furtherance of their scheme to defraud, the Retail Owners, through their respective Retailers, as a matter of practice and procedure, submitted bills and supporting documentation, for customized DME and/or orthotic devices that were never provided.

30.     On information and belief, to maximize their reimbursement, the Retail Owners, through their respective Retailers, submitted bills for, among other things, custom fit back and knee braces under Fee Schedule codes L0632 and L1844, among others. To be eligible for reimbursement under codes L0632 and L1844, the Retailers were required to take the specific measurements of the No-fault Claimant, including where appropriate height, weight and waist size. In addition, to be eligible for reimbursement under codes L0627 and L1820, among others, the Retailers were required to fit and adjust the DME and/or orthotic devices for the No-fault Claimant for whom the items(s) was prescribed.

31.     On information and belief, notwithstanding Defendants' routine and systematic submission of bills to Plaintiffs under Fee Schedule codes L0632, L1844, L0627 and L1820, as more fully alleged in Fee Schedule Scheme to Defraud section below, the Retail Owners, through their respective Retailers, did not actually provide the billed for custom fit DME and/or orthotic devices as reflected by the fact that they routinely failed to measure, fit or adjust the No-fault Claimants. By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims in which the No-fault Claimants denied having received customized DME and/or orthotic devices and/or having ever been measured, specially fit or adjusted for any item. By way of further example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of

fraudulent claims paid by Plaintiffs where one or more of the Retailers submitted fraudulent bills for customized DME and/or orthotic devices that were never provided, not provided as billed or provided pursuant to a predetermined course of treatment without regard to medical necessity and/or need.

32.    On information and belief, in numerous other instances, the Retail Owners, through their respective Retailers, intentionally submitted documents containing measurements that they falsely represented pertained to the No-fault Claimant, under whose policy, they were seeking reimbursement.  In reality, the measurements reflected in the documents submitted to Plaintiffs were entirely artificial and contrived, a fact confirmed through the No-fault Claimants' examinations under oath.  By way of example and not limitation, in connection with claim 0171290851, Defendant Khaimov, through Utopia Equipment, submitted a measurement form representing that the waist size for a certain No-fault Claimant was 32 inches, when in reality, the No-fault Claimant testified during the course of an examination under oath that not only was his waist size 40 inches, but also that no-one had ever taken his measurements.

33.    On information and belief, in furtherance of the scheme to defraud, Defendants also submitted or caused to be submitted fraudulent bills for DME and/or orthotic devices for which the Fee Schedule does not have a recognized code or permissible charge.  As more fully set forth in the Non-Fee Schedule Scheme to Defraud section below, at all relevant times mentioned herein, the Retailers, as a matter of pattern and practice, fraudulently submitted bills to Plaintiffs for Non-Fee Schedule DME and/or orthotic devices that were never provided, or if provided, were inexpensive, poor quality items, that Defendants falsely represented were expensive and sophisticated items, when they were not. In furtherance of the scheme to defraud, Defendants submitted or caused to be submitted fraudulent bills for Non-Fee Schedule items that

they falsely represented were Fee Schedule items to maximize their reimbursement under the No-fault Law.   By way of example and not limitation, Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims Plaintiffs paid where the Retail Owners, through their respective Retailers, fraudulently billed for Non-Fee Schedule items.

34.     On information and belief, the Defendant DME companies, retailers and wholesalers alike, were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law.

35.     Every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who provided, to the extent any DME and/or orthotic devices were provided, inferior, low quality items to No-fault Claimants that potentially compromised their health.

36.     The duration, scope and nature of the Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies.   Defendants did not engage in sporadic acts of fraud -- although that would be troubling enough -- they adopted a fraudulent blueprint as their business plan, and used it to participate in a systematic pattern of racketeering activity.   Every facet of Defendants' operation, from securing prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment to obtaining inflated wholesale invoices for inexpensive, low quality items to ensuring that No-fault Claimants signed blank delivery receipts falsely representing an acknowledgement of receipt of the billed for items to generating bills that contained codes not recognized under the relevant Fee Schedule in existence at the time or misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided was carried out for the purpose of committing fraud.

## NATURE OF THE ACTION

37.     This action is brought pursuant to:

      i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c)&(d) and 1964(c); and

      ii)     New York State common law.

## NATURE OF RELIEF SOUGHT

38.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and their assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

39.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $2,100,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that was never provided, or if provided, not the billed for item.

## THE PARTIES

### A.     Plaintiffs

40.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

41.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

15

42.     Plaintiff Allstate Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

43.     Plaintiff Allstate New Jersey Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Bridgewater, New Jersey.

44.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate New Jersey Insurance Company are collectively referred to as "Plaintiffs."

45.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York, and provide automobile insurance coverage to their policyholders under and in accordance with New York State Law.

**B.      The Individual Retail Owner Defendants**

46.     Amner Khaimov ("A. Khaimov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer LaPerla Supply and, at all times relevant herein, controlled every aspect of its activities.

47.     Zoya Aminova ("Aminova") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer Parsons Medical Supply and, at all times relevant herein, controlled every aspect of its activities.

48.     Murdakhay Khaimov ("M. Khaimov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailers Jamaica Medical Supply and Queens Medical Supply and, at all times relevant herein, controlled every aspect of their activities.

49.     Albert Khaimov is a natural person residing in the State of New York and is the principal, officer and/or director of Retailers Grand Medical Supply, Royal Medical Supply and Utopia Equipment and, at all times relevant herein, controlled every aspect of their activities.

50.     Yakov Aminov ("Aminov") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailers GNK Medical Supply and Highlawn Best Medical Supply and, at all times relevant herein, controlled every aspect of their activities.

51.     Ilya Tamayeff ("Tamayeff") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer New Capital Supply and, at all times relevant herein, controlled every aspect of its activities.

52.     Abraham Layliev ("Layliev") is a natural person residing in the State of New York and is the principal, officer and/or director of Retailer New Capital Supply and, at all times relevant herein, controlled every aspect of its activities.

53.     Robert Terdjanian ("Terdjanian") is a natural person residing in the State of New York and is a principal, officer and/or director of Retailer AVR Medical Supply and Wholesaler Teyla Corp., and, at all times relevant herein, controlled every aspect of their activities.  On information and belief, on or about October 7, 2010, Terdjanian was indicted by the United States Attorney's Office for the Southern District of New York for insurance fraud related-crimes.  Specifically, Terdjanian was indicted for, *inter alia*, conspiracy to commit mail fraud and health care fraud in violation of Title 18 United State Code §§ 1341, 1347 and 1349, in connection with a vast conspiracy to systematically defraud No-fault insurance carriers by submitting fraudulent claims for DME.

54.     On information and belief, under indictment number 10-cr-918, Defendant Terdjanian is accused of, *inter alia,* creating AVR Medical Supply as a shell company to facilitate

17

his fraudulent billing scheme and being part of a conspiracy that involved several other members, some of which provided patient identities and/or fraudulent prescriptions for DME, which Defendant Terdjanian then used to submit hundreds of fraudulent claims to No-fault insurance carriers worth hundred of thousands of dollars.

55.     Galina Vovk ("Vovk") a/k/a Valentina Babucea is a natural person residing in the State of New York and is a principal, officer and/or director of Retailer AVR Medical Supply and, at all times relevant herein, controlled every aspect of its activities. On information and belief, Vovk is the wife of Defendant Terdjanian and was also indicted by the United States Attorney's Office for the Southern District of New York for insurance fraud related-crimes on or about October 7, 2010. Similarly, Vovk was indicted for, *inter alia*, conspiracy to commit mail fraud and health care fraud in violation of Title 18 United State Code §§ 1341, 1347 and 1349, in connection with a vast conspiracy to systematically defraud No-fault insurance carriers by submitting fraudulent claims for DME.

56.     On information and belief, under indictment 10-cr-918, Vovk is accused of acting in furtherance of a conspiracy to defraud No-fault insurers by, among other things, opening or causing to open a bank account for Retailer AVR Medical Supply in the name of "Valentina Babucea," an alias used by Vovk, and using the home address of Defendant Terdjanian's parents as the business address for Retailer AVR Medical Supply.

**C.     The Individual Wholesale Owner Defendants**

57.     Vladislav Aguvayev ("Aguvayev") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesale Defendant Frazier Trading and, at all times relevant herein, controlled every aspect of its activities.

58.     Oleg Simakov ("Simakov") is a natural person residing in the State of New York

and is the principal, officer and/or director of Wholesale Defendant A to Z Wholesale and, at all times relevant herein, controlled every aspect of its activities.

59.     Sergey Mezkula ("Mezkula") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesale Defendant Global Best Deal Wholesale and, at all times relevant herein, controlled every aspect of its activities.

60.     Grigol Apresyantsi ("Apresyanti") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesale Defendant Grigol Supply and, at all times relevant herein, controlled every aspect of its activities.

61.     Marifat Davlatkhonova ("Davlatkhonova") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesale Defendant Hono Office Supply and, at all times relevant herein, controlled every aspect of its activities.

62.     Michael Zavrazhin ("Zavrazhin") is a natural person residing in the State of New York and is the principal, officer and/or director of Wholesale Defendant Major Market Merchandise and, at all times relevant herein, controlled every aspect of its activities.

**D.     The Corporate Retailer Defendants**

63.     On information and belief, LaPerla Supply, Inc., f/k/a New Millennium Supply, Inc. ("LaPerla Supply"), was incorporated on June 20, 2003, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 79-72 Cooper Ave., Glendale, New York 11385.  LaPerla Supply is owned, controlled and/or operated by Defendant A. Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

64.     On information and belief, Parsons Medical Supply, Inc. ("Parsons Medical

Supply") was incorporated on June 23, 2005, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 150-60 Coolidge Ave., Jamaica, New York 11432. Parsons Medical Supply is owned, controlled and/or operated by Defendant Aminova and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

65.     On information and belief, Jamaica Medical Supply, Inc. ("Jamaica Medical Supply") was incorporated on April 13, 2006, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 150-60 Coolidge Ave., Jamaica, New York 11432. Jamaica Medical Supply is owned, controlled and/or operated by Defendant M. Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

66.     On information and belief, Queens Medical Supply, Inc. ("Queens Medical Supply") was incorporated on January 29, 2007, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 82-69 Parsons Blvd., Jamaica, New York 11432. Queens Medical Supply is owned, controlled and/or operated by Defendant M. Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

67.     On information and belief, Grand Medical Supply, Inc. ("Grand Medical Supply") was incorporated on April 9, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 113 13th Street, Brooklyn, New York 11215. Grand Medical Supply is owned, controlled and/or operated by Defendant Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotics under the No-fault Law.

68.     On information and belief, Royal Medical Supply, Inc. ("Royal Medical Supply") was incorporated on July 9, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 108-39 46th Ave., Corona, New York 11368.   Royal Medical Supply is owned, controlled and/or operated by Defendant Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

69.     On information and belief, Utopia Equipment, Inc. ("Utopia Equipment") was incorporated on April 15, 2010, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 75-84 179th Street, Flushing, New York 11432.   Utopia Equipment is owned, controlled and/or operated by Defendant Khaimov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotics under the No-fault Law.

70.     On information and belief, GNK Medical Supply, Inc. ("GNK Medical Supply") was incorporated on September 24, 2008, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 118-40 Metropolitan Avenue, Kew Gardens, New York 11415.   GNK Medical Supply is owned, controlled and/or operated by Defendant Aminov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

71.     On information and belief, Highlawn Best Medical Supply, Inc. ("Highlawn Best Medical Supply") was incorporated on June 9, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 134 Highlawn Avenue, Brooklyn, New York 11223.   Highlawn Best Medical Supply is owned,

controlled and/or operated by Defendant Aminov and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

72. On information and belief, New Capital Supply, Inc. ("New Capital Supply") was incorporated on November 6, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 124-18 Metropolitan Ave., Kew Gardens, New York 11415. New Capital Supply is owned, controlled and/or operated by Defendants Tamayeff and Layliev and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

73. On information and belief, AVR Medical Supply, Inc. ("AVR Medical Supply") was incorporated on November 6, 2009, and is a retail DME supply company authorized to do business in the State of New York, with its principal place of business located at 1755 Ocean Parkway, Suite 4-A, Brooklyn, New York, 11223. AVR is owned, controlled and/or operated by Defendants Terdjanian and Vovk and, on information and belief, has submitted fraudulent claims to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

**E.     The Corporate Wholesale Defendants**

74. On information and belief, Frazier Trading Co., Inc. ("Frazier Trading") was incorporated on June 2, 2005, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2700 Stillwell Avenue, Brooklyn, New York 11224. Frazier Trading is owned, controlled and/or operated by Defendant Aguvayev and, on information and belief, supplies Retailers Jamaica Medical Supply and Queens Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive

DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

75.    On information and belief, A to Z Wholesale, Inc. ("A to Z Wholesale") was incorporated on September 23, 2009, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 118 Olympia Blvd., Staten Island, New York 10305. A to Z Wholesale is owned, controlled and/or operated by Defendant Simakov and, on information and belief, supplies Retailer Royal Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

76.    On information and belief, Bulls Eye Wholesale, Inc. ("Bulls Eye Wholesale") was incorporated on February 10, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 184 Robin Road, Staten Island, New York 10305. Bulls Eye Wholesale is owned, controlled and/or operated by John Doe 1 and, on information and belief, supplies Retailer Royal Medical Supply

and Utopia Equipment, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices:  (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

77.     On information and belief, E-Z Supply, Inc. ("E-Z Supply") was incorporated on January 30, 2008, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 79-72 Cooper Avenue, Glendale, New York 11385.   E-Z Supply is owned, controlled and/or operated by John Doe 2 and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices:  (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

78.     On information and belief, Global Best Deal, Inc. ("Global Best Deal") was incorporated on February 27, 2008, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 316 Avenue X,

Brooklyn, New York 11223.      Global Best Deal is owned, controlled and/or operated by Defendant Mezkula and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

79.     On information and belief, Grigol Supply, Inc. ("Grigol Supply") was incorporated on March 18, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 1479 Dahill Rd. Ste #A4, Brooklyn, New York 11204. Grigol Supply is owned, controlled and/or operated by Defendant Apresyanti and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

80.     On information and belief, Hono Office Supply, Inc. ("Hono Office Supply") was incorporated on August 19, 2009, and is a wholesale DME supply company authorized to do

business in the State of New York, with its principal place of business located at 2534 East 12th Street, Suite #2, Brooklyn, New York 11235. Hono Office Supply is owned, controlled and/or operated by Defendant Davlatkhonova and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

81.     On information and belief, MedCure Supplies, Inc. ("MedCure Supplies") was incorporated on February 9, 2009, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 73-20 Austin Street #4F, Forest Hills, New York, 11375. MedCure Supplies is owned, controlled and/or operated by John Doe 3 and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

82.     On information and belief, Telya Corp. ("Telya") was incorporated on August 30,

26

2007, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 73-20 Austin Street #4F, Forest Hills, New York 11375. Telya is owned, controlled and/or operated by Defendant Terdjanian and, on information and belief, is a shell company with no legitimate purpose, used by Defendants Terdjanian and Vovk to generate fraudulent wholesale invoices. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

83. On information and belief, Major Market Merchandise, Inc. ("Major Market Merchandise") was incorporated on August 10, 2007, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 2369 81st Street, Brooklyn, New York 11214. Major Market Merchandise is owned, controlled and/or operated by Defendant Zavrazhin and, on information and belief, supplies Retailer AVR Medical Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

84. On information and belief, VZ Group, Inc. ("VZ Group") was incorporated on September 18, 2008, and is a wholesale DME supply company authorized to do business in the

State of New York, with its principal place of business located at 2753 Harway Avenue, Brooklyn, NY 11214-5538. VZ Group is owned, controlled and/or operated by John Doe 4 and, on information and belief, supplies Retailer New Capital Supply, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

## F.     The John Doe Defendants

85.     John Doe 1 is the principal, officer and/or director of Wholesale Defendant Bulls Eye Wholesale and, at all times relevant herein, controlled every aspect of its activities.

86.     John Doe 2 is the principal, officer and/or director of Wholesale Defendant E-Z Supply and, at all times relevant herein, controlled every aspect of its activities.

87.     John Doe 3 is the principal, officer and/or director of Wholesale Defendant MedCure Supplies and, at all times relevant herein, controlled every aspect of its activities.

88.     John Doe 4 is the principal, officer and/or director of Wholesale Defendant VZ Group and, at all times relevant herein, controlled every aspect of its activities.

89.     On information and belief, John Does 5 through 20 are the principals, officers and/or directors of the ABC Corporations. On information and belief, John Doe Defendants 5 through 20, through the ABC Corporations, entered into kickback and/or other financial compensation agreements with the Retailers to provide inexpensive DME and/or orthotic devices

and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiffs. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**G.   The ABC Corporations**

90.    On information and belief, the ABC Corporations are additional corporations which purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (1) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (2) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement. These ABC Corporations will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

91.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(l) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. §§ 1331, this Court also has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States; and principles of pendent jurisdiction.

92.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

93.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

94.     Plaintiffs underwrite automobile insurance in New York State.

95.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

96.     On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.   In exchange for their services, the Retailers accept assignments of benefits from the patients covered under the No-fault Law (the "No-fault claimants" or "claimants") and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

97.     In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 *et seq.*, the Retailers submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3") or a substantially similar form.

98.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Retailers contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

99.   To process and verify claims submitted by the Retailers, Plaintiffs required, and the Retailers submitted prescriptions for DME and/or orthotic devices, receipts confirming delivery of the billed for DME and/or orthotic devices and other documents relative to the DME and/or orthotic devices allegedly supplied to No-fault claimants, for which the Retailers were seeking reimbursement from Plaintiffs.

100.   On information and belief, with the exception of Retailers, GNK Medical Supply, Highlawn Best Medical Supply, Grand Medical Supply, LaPerla Supply and Parsons Medical Supply, the Retailers also submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement.

101.   Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of proof of claim.

102.   To fulfill its obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and has paid the Retailers based on the representations and information that Defendants mailed to Plaintiffs.

103.   DME generally refers to equipment and/or supplies used for a medical purpose by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools.

104.   Orthotic devices generally refer to items that are used to support a weak or

deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, ankle braces, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

105. The New York State Medicaid program has established limits on the maximum permissible charges for, among other things, DME and/or orthotic devices. These limits are listed on the New York State DME Services Fee Schedule.

106. Effective October 6, 2004, the Superintendent of Insurance adopted the Medicaid Fee Schedule for the reimbursement of DME and/or medical supplies through the 28th amendment to "Regulation 83" by providing that "the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. *See* 11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F); [(hereinafter "Fee Schedule Items")].

107. With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee payable for the specific item [(hereinafter "Non-Fee Schedule Items")], the Department of Insurance regulation provides that the fee payable shall be the lesser of:

     (1)    the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

     (2)    the usual and customary price charged to the general public.

11 N.Y.C.R.R § 68 (Appendix 17-C, Part F).

108. On information and belief, the Retailers were created as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices

that were never provided, or not provided as billed or if provided, were of inferior quality relative to what was represented in the bills submitted to Plaintiffs to have been provided and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices.

109. The services that the Retailers purported to provide, and for which they billed Plaintiffs, seldom varied from patient-to-patient over a given period of time, or reflect any differences in the patient's condition. Instead, the Retail Owners, through their respective Retailers, created a billing apparatus that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no treatment at all.

110. The Retailers created and controlled by the Retail Owners were part of separate, but well-organized illegal enterprises that engaged in fundamentally similar, systematic and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices. On information and belief, the components of each enterprise followed practices that were part of a racketeering scheme dictated by the Retail Owners:

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills for DME and/or orthotic devices that were never provided to No-fault claimants.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented that the charges

33

for the DME and/or orthotic devices purportedly supplied did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted delivery receipts in support of their bills that purport to demonstrate the No-fault Claimant's acknowledged receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts are routinely signed by the No-fault Claimants in blank and/or oftentimes contain forged signatures.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices that systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (i.e. make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices reflecting prices far in excess of those actually paid, concealing the manufacturer, make, model, size, and quality of the DME and/or orthotic devices purportedly supplied.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed.

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback arrangement with No-fault Clinics.

- Unlike legitimate retail DME companies, the Retailers, through the Retail Owners and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics.

- Unlike legitimate retail DME companies, the Retail Owners,

through their respective Retailers, entered into illicit relationships with the Wholesale Defendants, who, in exchange for kickbacks and/or a fee, provided wholesale invoices that fraudulently inflated the price, quantity and/or item provided, with the payments relating to such wholesale invoices actually serving as the vehicle through which Defendants laundered the money back to the Retail Owners through the use of check cashing establishments.

111.   In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

112.   The members of each of the DME Network Enterprises played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the Enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, the Retail Owners:

- Entered into kickback arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their associated doctors and/or chiropractors prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment, irrespective of medical necessity or need;

- Entered into kickback arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

- Entered into kickback arrangements with one ore more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices which grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices.

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many claimants;

- Prepared or caused to be prepared fraudulent bills and sent them to Plaintiffs;

- Participated, or caused those acting under their direction, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

113.   By way of further example and not limitation, in furtherance of their scheme to
defraud, the Wholesale Owners, through the Wholesalers:

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them in support of fraudulent claims for reimbursement.

114.   By way of further example, in furtherance of the scheme to defraud alleged
herein, the Wholesalers:

- Unlike legitimate wholesale DME companies, provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices which grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices.

- Unlike legitimate wholesale DME companies, provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone.

- Unlike legitimate wholesale DME companies, provided the essential means through which the Retail Owners were able to submit fraudulent bills to Plaintiffs for reimbursement of DME and/or orthotic devices under the No-fault Law.

- Unlike legitimate wholesale DME companies, knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by the Retail Owners, through their respective Retailers, to insurers.

- Unlike legitimate wholesale DME companies, knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and

36

quality of the DME and/or orthotic devices reflected in the bills submitted by the Retail Owners, through their respective Retailers, to insurers.

- Unlike legitimate wholesale DME companies, in furtherance of the money laundering scheme, converted the checks they received from the Retailers to cash and returned to the Retailers up to 90% of the wholesale invoice amounts.

115. At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the Wholesalers were providing fraudulent wholesale invoices to the Retailers that misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

116. At all relevant times mentioned herein, the Wholesale Owners, either directly or though others acting under and pursuant to their directions, instructions and control, caused fraudulent wholesale invoices to be provided to the Retailers that they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

117. At all relevant times mentioned herein, the Wholesaler Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiffs, in particular in connection with fraudulent claims.

118. At all relevant times mentioned herein, the Wholesaler Owners, acting in concert with their respective Retailers and Retail Owners, participated in, conducted, controlled, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

119. At all times mentioned herein, by providing fraudulent wholesale invoices, the Wholesalers provided the essential means in furtherance of the scheme to defraud alleged in this Complaint.

120. At all relevant times mentioned herein, the Retail Owners knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

121. At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, except for GNK Medical Supply, Highlawn Best Medical Supply, Grand Medical Supply, LaPerla Supply and Parsons Medical Supply, directly or though others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

122. At all relevant times mentioned herein, the Retail Owners, acting in concert with their respective Wholesale Defendants, participated in, conducted, controlled, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

123. At all times mentioned herein, the fraudulent wholesale invoices provided by the Wholesale Defendants provided the essential means by which the Retail Owners, through their respective Retailers, were able to further the scheme to defraud alleged in this Complaint.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

124. On information and belief, beginning in 2003 and continuing until the present day, Defendants, and others not named in the Complaint, have engaged in a systematic fraudulent billing scheme based upon the alleged sale of DME and/or orthotic devices.

125. On information and belief, the Retail Owners incorporated, owned and controlled their respective Retailers for the purpose of defrauding insurers, in general, and Plaintiffs in

particular.

126.    On information and belief, each of the Retailers, through the Retail Owners, engaged in virtually identical and parallel schemes to defraud wherein the Retail owners (i) paid kickbacks to the No-fault Clinics in exchange for referrals of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment as opposed to need; (iii) paid fees (pursuant to the money laundering scheme described above) to the Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, the Retail Owners, through their respective Retailers, were determining, during any particular period of time, what DME would be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices during such period of time from a particular Retailer.

127.    While each DME enterprise alleged in this complaint carried out its scheme to defraud through substantially similar means, in some instances, to avoid suspicion and detection by insurance companies, certain Retail Owners incorporated more than one Retailer that they also owned, controlled and operated.  By way of example and not limitation, Defendant Khaimov incorporated Grand Medical Supply, on or about April 9, 2008.  Thereafter, on or about July 9, 2008, to avoid the scrutiny of insurance companies, Defendant Khaimov formed Royal

Medical Supply as a new corporation to replace Grand Medical Supply and to carry on the scheme to defraud alleged herein.

128.    Similarly, and in anticipation of the likelihood that Royal Medical Supply's fraudulent activities would fall under the same scrutiny as Grand Medical Supply, Defendant Khaimov formed Utopia Equipment on or about April 15, 2010 to replace Royal Medical Supply when necessary.   Additional examples of successor Retailers created to avoid scrutiny by insurance companies in furtherance of the scheme to defraud are identified in the table below:

| Retailer | Date Of Incorporation | Owner | Office Location |
|---|---|---|---|
| Jamaica Medical Supply | 4/06 | M. Khaimov | 150-60 Coolidge Ave., Jamaica, New York 11432 |
| Queens Medical Supply | 1/07 | M. Khaimov | 82-69 Parsons Blvd., Jamaica, New York 11432 |
| Grand Medical Supply | 4/08 | Khaimov | 113 13th Street, Brooklyn, New York 11215 |
| Royal Medical Supply | 7/08 | Khaimov | 108-39 46th Ave., Corona, New York 11368 |
| Utopia Equipment | 4/10 | Khaimov | 75-84 179th Street, Flushing, New York 11432 |
| GNK Medical Supply | 9/08 | Aminov | 118-40 Metropolitan Avenue, Kew Gardens, New York 11415 |
| Highlawn Best Medical Supply | 7/09 | Aminov | 134 Highlawn Avenue, Brooklyn, New York 11223 |

129.    On information and belief, in instances where a Retail Owner incorporated more than one Retailer, when the new Retailer was incorporated, the one incorporated immediately before it was gradually phased out and stopped billing insurance companies, in general, and

Plaintiffs, in particular, allowing for only a brief overlap before entirely melting away.

130. On information and belief, even in those instances where a Retail Owner incorporated and operated a single Retailer, their fraudulent blueprint was substantially the same.

131. On information and belief, with the retail DME defendants in place, Defendants devised, and carried out, fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were inferior quality and inexpensive items that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

132. In exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in Brooklyn, Queens, Bronx, Nassau, Suffolk and Westchester Counties, through their medical doctors and/or chiropractors, provided the Retailers with prescriptions for DME and/or orthotic devices pursuant to a standard protocol or predetermined course of treatment, without regard to medical necessity or need. By way of example and not limitation, in connection with claim 0181387985, a No-fault Clinic operating in Kings County prescribed, among other things, a thermophore for a No-fault Claimant even after the No-fault Claimant advised the clinic that he already owned two thermophores, explaining that it was part of their protocol since the insurance would pay for it.

133. On information and belief, regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating out of Brooklyn, Queens, Bronx, Nassau, Suffolk and Westchester Counties, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics would issue a prescription for a standard battery of

DME and/or orthotic devices, regardless of whether such items medically necessary, or otherwise needed.

134. On information and belief, irrespective of the purported complaints of pain or type of injury documented in connection with a particular claim, the No-fault Clinics prescribed virtually the exact same DME and/or orthotic devices to its patient population, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or involvement in an accident.

135. On information and belief, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics, operating in the boroughs of Brooklyn, Queens, Bronx, Nassau, Suffolk and Westchester, also directed their associated physicians, chiropractors and/or other providers to prescribe DME and/or orthotic devices which are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and to ensure that the prescriptions issued were generic and non-descript, meaning that they omit any detailed description of the items to be supplied to the No-fault Claimants.

136. On information and belief, in furtherance of the scheme to defraud, the No-fault Clinics did not provide the No-fault Claimants with the prescriptions for DME and/or orthotic devices. Instead, the prescriptions for DME and/or orthotic devices were given directly to the Retailers to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

137. On information and belief, in addition to prescribing Non-Fee Schedule Items, as part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for

certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, lumbar cushions and thermophores, which the Retailers then used in support of their claims for reimbursement at a higher rate.

138.    On information and belief, by submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly provided.

139.    On information and belief, as part of the kickback or other financial compensation agreement with the No-fault Clinics, and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimant would be given a number of documents to complete and sign, including but not limited to assignment of benefit forms and one or more blank delivery receipts. By doing so, the Retailers were able to fill in the DME and/or orthotic devices on the receipts without having to actually provide the items since there is no legitimate acknowledgment of receipt from the No-fault Claimant.

140.    At other times, on information and belief, the delivery receipt forms were completed before the No-fault Claimants were required to sign the forms, meaning that DME and/or orthotic devices were already listed on the forms even before the No-fault Claimant was seen by a doctor.

141.    On information and belief, in instances where the No-fault Claimant did not sign the blank delivery receipts, the Retailers forged or caused to be forged the No-fault Claimant's signature. By way of example and not limitation, in connection with claims 4145798196, 0172910234 and 0174337963, one or more No-fault Claimants confirmed that the signature on the delivery receipts submitted to Plaintiffs was a forgery.

142. On information and belief, in furtherance of the scheme to defraud alleged herein, in every instance, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

143. On information and belief, in furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

144. On information and belief, in addition to entering into kickback arrangements with No-fault Clinics, Defendants Terdjanian and Vovk, entered into separate agreements with others employed or otherwise associated with one or more hospitals operating in Kings County to obtain personal information, including name and contact information, of persons allegedly involved in motor vehicle accidents so that they could recruit them to serve as patients for whom they could submit fraudulent bills for, among other things, DME and/or orthotic devices.

145. On information and belief, in furtherance of the scheme to defraud, and in exchange for a kickback, one or more hospital employees, not named in this Action, would provide Defendants Terdjanian and Vovk confidential contact information for people who were generally involved in accidents involving minor impacts and were otherwise uninjured, or people who were willing to pose as if they had been injured in motor vehicle accidents, when in fact they had not been.

146. On information and belief, once in receipt of the confidential patient information, Defendant Terdjanian, posing as someone associated with the hospital would contact and refer these individuals to the No-fault Clinics that Defendants Terdjanian and Vovk knew would provide them with the prescriptions they needed to fraudulently bill insurers, including Plaintiffs,

for DME and/or orthotic devices that were not medically necessary.

147.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers entered into agreements with one or more of the Wholesale Defendants whereby the Wholesale Defendants supplied the Retailers with invoices that were used to document inflated and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

148.    On information and belief, separate and apart from the agreements Defendants Terdjanian and Vovk had with one or more Wholesale Defendants, they purchased DME from one or more foreign importers, and then created fake wholesale invoices in the name of Telya Corporation, a shell company controlled by Defendant Terdjanian that had no actual business purpose other than its role in the scheme to defraud.

149.    On information and belief, in furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by the Wholesale Defendants to the Retailers included artificial prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

150.    On information and belief, to the extent the Retailers provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items which were materially misrepresented in the wholesale invoices received from the Wholesale Defendants.

151.    On information and belief, the wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, upwards of 10 to 20 times the actual prices, that the Retailers paid for the DME and/or orthotic devices, when they were actually provided.

45

152. On information and belief, in furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by the Wholesale Defendants to the Retailers intentionally omitted the make, model or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice, alone.

153. In other instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by the Wholesale Defendants to the Retailers were never provided to the Retailers; rather the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

154. On information and belief, the wholesale invoices were provided to the Retailers to camouflage the conversion of the Retailers' checks payable to the Wholesale Defendants to cash at check cashing establishments.

155. On information and belief, the Retailers would issue checks to the Wholesale Defendants for the full amount of the inflated wholesale invoice. The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the profits of the scheme for themselves.

156. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers requested that the Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items, when, in fact, they did not.

157. On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including but not limited

to claim forms, prescriptions, delivery receipts and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

158. On information and belief, the Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

159. On information and belief, the fraudulent wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual cost of the DME and/or orthotic devices purportedly provided.

160. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided.

161. On information and belief, in furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

162. On information and belief, in furtherance of the scheme to defraud alleged herein, upon receiving the fraudulent wholesale invoices from the Wholesale Defendants, the Retailers as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the actual amounts that they paid for DME and/or orthotic devices.

163. On information and belief, in furtherance of the scheme to defraud alleged herein,

the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs wherein they misrepresented that certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing phantom codes for which there was no published fee schedule. In doing so, the Retail Owners, through their respective Retailers, materially misrepresented the nature, quality and cost of the billed for DME and/or orthotic device and deliberately misrepresented the amounts they were entitled to receive under the No-fault Law. By way of example and not limitation, codes E0941, E1310 and E0217 were each used on bills submitted by one or more Retailers to Plaintiffs for reimbursement even though none of these codes are recognized in the Fee Schedule. By way of further example and not limitation, Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims in which the Retailers submitted bills containing codes not recognized in the Fee Schedule.

164.    On information and belief, in furtherance of the scheme to defraud alleged herein, in contravention of Regulation 83 which provides, among other things, that where the New York State Medicaid program has not established a fee payable for the specific durable medical item, the fee shall be the lesser of (1) the acquisition cost to the provider plus 50%; or (2) the usual and customary price charged to the general public, the Retailers routinely submitted bills wherein they materially misrepresented that the fee(s) charged reflected the lesser of their acquisition costs or the actual and customary price charged to the general public, the Retailers routinely generated and submitted bills to Plaintiffs knowingly misrepresenting the amounts that they paid for DME and/or orthotic devices to maximize their reimbursement under the No-fault Law. By way of example and not limitation, Exhibit "8"in the accompanying Compendium of Exhibits is a spreadsheet identifying a representative sample of claims in which the Retailers submitted bills

for Non-Fee-Schedule items that materially misrepresented the actual amounts they paid for DME and/or orthotic devices.

165. On information and belief, separate and apart from submitting bills using codes that are not recognized in the Fee Schedule, as more fully set forth in the Fee Schedule Scheme to Defraud, the Retailers routinely submitted bills to Plaintiffs for items that were never provided and/or contained Fee Schedule code descriptions that failed to correspond with the equipment purportedly being provided. By way of example and not limitation, under claim number 0159174143, Defendant New Capital Supply billed for a "general use wheelchair back cushion" using code E2611 for $282.68, when it did not provide such DME. By way of further example and not limitation, in connection with claim numbers 0140844473-01, 0140844473-14 and 0140844473-15, Defendant Royal Medical Supply billed for a "general use wheelchair back cushion" using code E2611 for $297.45, when it did not provide such DME.

166. On information and belief, in furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, each and every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

167. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom-fitted DME and/or orthotic devices, such as LSOs, knee, wrist, elbow and shoulder braces that were never provided. In other instances, the Retail Owners, through their respective Retailers routinely submitted fraudulent bills in support of expensive

DME and/or orthotic devices that required a fitting and/or adjustment that they never performed. By way of example, and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which the Retail Owners, through their respective Retailers, billed for expensive custom-fitted DME and/or orthotic devices that were never provided. In addition, Exhibit "10" is a representative sample of claims in which the Retail Owners, through their respective Retailers, billed for supports and/or braces that required fitting and adjustments, which they never performed.

168. On information and belief, Defendants' activity promoted and facilitated other acts that incurred costs to Plaintiffs well beyond the insurance proceeds that Defendants collected, including but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath ("EUO") and associated attorneys' and court reporting fees, independent medical examinations ("IME") and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

### 1. Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule

169. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills for Non-Fee Schedule items, such as EMS Units, massagers, whirlpool baths and water heat and cold circulation units, wherein they misrepresented that those items were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, they were utilizing phantom codes for which there was no published fee schedule. By way of example, and not limitation, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply,

routinely submitted bills to Plaintiffs for whirlpools, using phantom codes E1300 and/or E1310, which are not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $250.00 to in excess of $500.00, notwithstanding that to the extent anything was provided, the whirlpools are inexpensive "jet spas," which should have been billed at no more than $90.00. Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills for whirlpools using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

170.    On information and belief, by billing under the phantom codes, the Retail Owners, through their respective Retailers, billed and were paid three to five times more than they would have otherwise have been entitled to receive under the No-fault Law. By way of example and not limitation, in connection with claim 0127569267-08, Retailer GNK Medical Supply submitted a fraudulent bill for a whirlpool using a phantom code in which it misrepresented the nature, quality and cost of the billed for item; by way of further example and not limitation, in connection with claim 3635311859, Retailer Jamaica Medical Supply submitted a similar fraudulent bill using the same phantom code on behalf of two assignors; and in connection with claim 0169493525-13, Retailer Royal Medical submitted a similar fraudulent bill for a whirlpool using the same phantom code and materially misrepresenting the nature, quality and cost of the billed for item, assuming it was provided.

171.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply routinely submitted bills to Plaintiffs for "Water Heat and Cold Circulation Units," using phantom codes E0207, E0217

and/or E0237, which are not recognized in the Fee Schedule, in amounts in excess of $500.00, notwithstanding that, to the extent anything was provided, the water circulating units and pads were aqua relief systems that should have been billed at no more than $337.50. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers billed for a water circulation unit under a phantom code.

172. On information and belief, by billing under the phantom codes, the Retail Owners, through their respective Retailers, billed and were paid nearly one and a half times more than they would have otherwise have been entitled to receive under the No-fault Law.

173. On information and belief, separate and apart from billing for whirlpools and water circulation units under phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, routinely submitted bills for other Non-Fee Schedule items using phantom codes that are not recognized in the Fee Schedule, in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive. By way of example, and not limitation:

- On information and belief, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply routinely submitted bills to Plaintiffs for "Bed Boards" in amounts in excess of $100 using phantom code E0315 and E0273, notwithstanding that to the extent any DME was provided, the "Bed Board" purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the legitimate wholesale cost did not exceed $20.00 and, therefore, should have been billed at $30. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers billed for Bed Boards under a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- On information and belief, the Retail Owners, through their

respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply and Highlawn Best Medical Supply routinely submitted bills to Plaintiffs for car seats using phantom codes and E5354, in amounts in excess of $175.00, notwithstanding that to the extent any DME was provided, the car seats were inexpensive bubble pads, reimbursable, if at all, as a Non-fee scheduled item, for which the legitimate wholesale cost did not exceed $20.00 and therefore, should have been billed at no more than $30.    Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the foregoing Retailers billed for car seats under a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- On information and belief, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply routinely submitted bills to Plaintiffs for E.M.S. Unit Four Leads ("EMS Units"), using phantom codes E0745 and/or E0744 in amounts in excess of $550.00, notwithstanding that to the extent anything was provided, the EMS Units, Accessory Kits and Placement Belts are actually cheap "digital therapy machines" and/or TENS Units, reimbursable, if at all, as Non-Fee Schedule items, for which the legitimate wholesale cost did not exceed $20.00 and, therefore, should have been billed at no more than $30.00. Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers billed for EMS units under a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- On information and belief, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for infrared heating lamps, using phantom code E0205, in amounts in excess of $190.00, notwithstanding that to the extent anything was provided, the infrared heating lamps were actually cheap, hand held items, reimbursable, if at all, as a Non-Fee Schedule item, for which the legitimate wholesale cost did not exceed $20.00, and therefore, should have been billed at no more than $30.00. Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers billed for

infrared heating lamps under a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- On information and belief, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Queens Medical Supply and Grand Medical Supply routinely submitted bills to Plaintiffs for hot/cold packs, using phantom code E9999 in amounts in excess of $80.00, notwithstanding that to the extent anything was provided, hot/cold packs are inexpensive items, reimbursable, if at all, as a Non-Fee Schedule item, for which the legitimate wholesale cost did not exceed $15.00, and, therefore, should have been billed at no more than $22.50. Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the foregoing Retailers billed for hot/cold packs under a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- By way further example, and not limitation, the Retail Owners, through their respective Retailers, including New Capital Supply, GNK Medical Supply and Highlawn Best Medical Supply routinely submitted bills to Plaintiffs for "vibrating deep heat massagers" or "back massagers" using code 99070, in amounts in excess of $175.00, falsely representing that the lesser of New Capital Supply's acquisition cost, plus 50% or the usual and customary price charged to the general public is approximately $116.00, when, on information and belief, to the extent anything was provided, the massagers were simple, hand held massagers for which the legitimate wholesale costs did not exceed $20.00, and therefore, should have been billed at no more than $30.00. Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the foregoing Retailer materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and its acquisition costs.

174. By submitting bills to Plaintiffs which contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost, plus 50% or the usual and customary price for the public, when in reality to the extent anything was provided, the items did not have a fee schedule and the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected

in their bills.

175.    By submitting bills to Plaintiffs which contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what they would have otherwise have been entitled to receive under the No-fault Law, when, in reality, to the extent any DME and/or orthotic device was provided at all, the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

176.    On information and belief, in addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, the Retailers' bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, for DME and/or orthotic devices that were inexpensive and of poor quality.

### 2.    Fraudulent Billing Using Code 1399

177.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, including Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply, routinely submitted bills for Non-Fee Schedule items, using Fee Schedule Code E1399, which is reserved for miscellaneous items, in which they materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and their acquisition costs. By way of example, and not limitation, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical

Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for massagers using code E1399, in amounts in excess of $175.00, falsely representing that the lesser of the Retailer's acquisition cost, plus 50% or the usual and customary price charged to the general public is approximately $116.00, when, on information and belief, to the extent anything was provided, the massagers were simple, hand held massagers for which the legitimate wholesale costs did not exceed $20.00, and therefore, should have been billed at no more than $30.00. Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers materially misrepresented the nature and quality of the massagers billed for and their acquisition costs. Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers billed for DME and/or orthotic devices under code E1399.

178. By way of further example and not limitation:

- On information and belief, Defendants Terdjanian and Vovk, through AVR Medical Supply routinely submitted bills to Plaintiffs for "Bed Boards" using code E1399 in the amount of $138.00, falsely representing that the lesser of AVR Medical Supply's acquisition cost, plus 50% or the usual and customary price charged to the general public is approximately $92.00, when, on information and belief, to the extent anything was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material for which its legitimate wholesale cost did not exceed $20.00, and therefore, should have been billed at no more than $30.00. Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Defendants materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and their acquisition costs.

- On information and belief, in connection with claims 172156168 and 170517726, Defendants Terdjanian and Vovk, through AVR Medical Supply routinely submitted bills to Plaintiffs for car seats using code E1399 in the amount of $80.00, falsely representing that the lesser of AVR Medical Supply's acquisition cost, plus 50% or the usual and customary price charged to the general public is approximately $53.00, when, on information and belief, to the extent

anything was provided, the car seats were inexpensive bubble pads for which the legitimate wholesale cost did not exceed $20.00, and therefore, should have been billed at no more than $30.00.

- On information and belief, Defendants Terdjanian and Vovk, through AVR Medical Supply, routinely submitted bills to Plaintiffs for E.M.S. Unit Four Leads ("EMS Units"), using code E1399 in amounts in excess of $660.00, falsely representing that the lesser of AVR Medical Supply's acquisition costs, plus 50% or the usual and customary price charged to the general public is approximately $440.00, when to the extent anything was provided, the EMS Units, Accessory Kits and Placement Belts were actually cheap "digital therapy machines" and/or Tens Units for which the legitimate wholesale cost did not exceed $20.00, and therefore, should have been billed at no more than $30.00. Exhibit "22" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Defendants materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and their acquisition costs.

- On information and belief, Defendants Terdjanian and Vovk, through AVR Medical Supply, routinely submitted bills to Plaintiffs for whirlpools, using code E1399 in the amount of $570.00, falsely representing that the lesser of AVR Medical Supply's acquisition costs, plus 50% or the usual and customary price charged to the general public is approximately $380.00, when to the extent anything was provided, the whirlpools are inexpensive "jet spas" for which the legitimate wholesale cost did not exceed $60.00, and therefore, should have been billed at no more than $90.00. Exhibit "23" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Defendants materially misrepresented the nature and quality of the billed for DME and/or orthotic devices and their acquisition costs.

### 3. Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes

179. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, including Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for Non-Fee Schedule Items, using codes reserved for Fee Schedule Items in order to maximize the fraudulent

charges they could submit to Plaintiffs, despite the fact that they never provided the billed for items. By way of example and not limitation, in connection with claim numbers 4145093102, 0120707773, 0160673125, 0137105144, 0141229988 and 0158095405-01, the Retail Owners, through their respective Retailers, including Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply and AVR Medical Supply, routinely submitted bills to Plaintiffs for "eggcrate mattresses," which is a Non-Fee Schedule Item, using code E0272, which is reserved for a "Foam Rubber Mattress," which is a Fee Schedule item.

180.    On information and belief, the Retailers never provided Foam Rubber Mattresses to any No-fault Claimant.

181.    On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided simple bubble mattress pads, which they described as "eggcrate mattresses," for which the legitimate wholesale cost did not exceed $20.00, meaning that the maximum reimbursement for such an item would be no more than $30.00.

182.    On information and belief, by submitting bills using code E0272, the Retail Owners, through their respective Retailers, including Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply materially misrepresented that they provided Foam Rubber Mattresses, when they did not.

183.    On information and belief, by submitting bills for an eggcrate mattress, which is a Non-Fee Schedule item, using code E0272, the Retail Owners, through their respective Retailers, including Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical materially

misrepresented that the item purportedly provided was a Fee Schedule Item and sought reimbursement in an amount well over three times what would otherwise have been a permissible charge for the Non-Fee Schedule item.

184.    By way of further example and not limitation, in connection with claim numbers 0133853993, 00140380320-02, 0140380320-04, 0140844473-01 and 0140804473-14, Defendant Khaimov, through Grand Medical Supply, Royal Medical Supply and Utopia Equipment routinely submitted bills to Plaintiffs for "eggcrate mattresses," which is a Non-Fee Schedule Item, using code using code E0184, which is reserved for "Dry Pressure Mattresses," which is a Fee Schedule item.

185.    On information and belief, the Retailers never provided a Dry Pressure Mattress to any No-fault Claimant.

186.    On information and belief, to the extent any DME and/or orthotic device was provided, the Retailers provided simple bubble mattress pads, which they described as "eggcrate mattresses," for which the legitimate wholesale cost did not exceed $20.00, meaning that the maximum reimbursement for such an item would be no more than $30.00.

187.    On information and belief, by submitting bills using code E0184, Defendant Khaimov, through Grand Medical Supply, Royal Medical Supply and Utopia Equipment, materially misrepresented that they provided Dry Pressure Mattresses, when they did not.

188.    On information and belief, by submitting bills for an eggcrate mattress, which is a Non-Fee Schedule item, using code E0184, Defendant Khaimov, through Grand Medical Supply, Royal Medical Supply and Utopia Equipment materially misrepresented that the item purportedly provided was a Fee Schedule Item and sought reimbursement in an amount well over three times what would otherwise have been a permissible charge for the Non-Fee Schedule

item.

## FEE SCHEDULE SCHEME TO DEFRAUD

**1.      Fraudulent Billing for Custom-fitted DME and/or Orthotic Devices**

189.    On information and belief, in furtherance of the scheme to defraud, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted fraudulent bills in support of expensive custom-fitted DME and/or orthotic devices, including but not limited to lumbosacral orthosis ("LSOs") that were never provided.

190.    Under the relevant Fee Schedule in existence at the time, the permissible charges for LSOs range from $43.27, under code L0625 for basic, prefabricated LSOs that require a fitting and adjustment, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

191.    On information and belief, the term custom-made and/or custom-fabricated as used in the New York State Fee Schedule refers to any DME, orthopedic footwear, orthotics, or prosthetics fabricated solely for a particular person from mainly raw materials which cannot be readily changed to conform to another person's needs.

192.    On information and belief, raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings and patterns.

193.    On information and belief, to bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the

items and fabricate the custom-made item based on those measurements.

194.    On information and belief, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs seeking reimbursement for expensive, custom-fitted back braces that were never provided.    By way of example and not limitation, Exhibit "24" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills for expensive, custom fitted back braces that were never provided.

195.    On information and belief, to the extent any DME and/or orthotic devices was provided, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply provided cheap, elastic, one-size-fits-all back braces, which were not custom made to the claimants' measurements and for which no fitting and/or adjustment was ever performed.    By way of example, and not limitation, Exhibit "25" in the accompanying Compendium of Exhibits is a representative sample of claims where one or more of the Retailers fraudulently billed for custom-fitted LSOs that were not provided. By way of further example, and not limitation, Exhibit "26" in the accompanying Compendium of Exhibits is a representative sample of claims where one or more of the Retailers fraudulently billed for LSOs that required fitting and adjustments that were never performed.

196.    On information and belief, in furtherance of the scheme to defraud, and to ensure

they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted fraudulent bills for LSOs using codes L0631, L0632, L0633, L0636, L0637 and/or L0629, which are reserved for more complex custom-fit DME and/or orthotic devices. Exhibit "27" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for LSOs using code L0631, L0632, L0633, L0636, L0637 and/or L0629.

197. On information and belief, by billing LSOs under codes L0631, L0632, L0633, L0636, L0637 and/or L0629, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply falsely represented that they measured the No-fault Claimant who purportedly received the DME and/or orthotic device, when they did not; and that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimants' measurements, tracings and patterns, which they did not.

198. On information and belief, separate and apart from billing for custom fit LSOs, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New

Capital Supply and AVR Medical Supply routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a fitting or adjustment, which was never performed. See Exhibit "10."

199. Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace that requires a fitting and adjustment, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

200. On information and belief, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Highlawn Best Medical Supply, New Capital Supply, Royal Medical Supply and Utopia Equipment routinely submitted bills to Plaintiffs seeking reimbursement for expensive custom-fitted knee braces that were never provided. By way of example and not limitation, Exhibit "28" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills for custom-fitted knee braces that were never provided.

201. On information and belief, to the extent any DME and/or orthotic devices was provided, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply provided cheap, elastic, one-size-fits-all knee braces, which were not custom made to the claimants' measurements and for which no fitting and/or adjustment was ever performed.

202. On information and belief, in furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in

existence at the time for knee braces, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Highlawn Best Medical Supply, New Capital Supply, Grand Medical Supply, Royal Medical Supply and Utopia Equipment routinely submitted fraudulent bills for knee braces using codes L1844, L1845 and/or L1846, which is reserved for more complex custom-fit DME and/or orthotic devices. By way of example and not limitation, Exhibit "29" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for knee braces using code L1844, L1845 and/or L1846.

203. On information and belief, by billing knee braces under codes L1844 and/or L1846, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply, Royal Medical Supply, Grand Medical Supply and Utopia Equipment falsely represented that they measured the No-fault Claimant who purportedly received the DME and/or orthotic device, when they did not; and that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimants' measurements, tracings and patterns, which they did not.

204. On information and belief, separate and apart from billing for custom fit knee braces, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, GNK Medical Supply, Highlawn Best Medical Supply, New Capital , Grand Medical Supply and AVR Medical Supply routinely submitted bills for knee braces using code L1820, which is reserved for prefabricated

DME and/or orthotic devices that require a fitting or adjustment, which was never performed. By way of example and not limitation, Exhibit "30" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for knee braces using code L1820.

205.    Under the relevant Fee Schedule in existence at the time, the permissible charge for a basic shoulder orthosis is $40.00 under L3650, which requires a fitting and adjustment.

206.    On information and belief, to the extent any DME and/or orthotic devices was provided, the Retail Owners, through their respective Retailers, including Grand Medical Supply, New Capital Supply, Utopia Equipment, Royal Medical Supply, Queens Medical Supply and GNK Medical Supply provided cheap, elastic, one-size-fits-all shoulder supports, for which no fitting and/or adjustment was ever performed. By way of example, and not limitation, Exhibit "31" in the accompanying Compendium of Exhibits is a representative sample of claims where one or more of the Retailers fraudulently billed for shoulder supports where no fitting and/or adjustment was performed.

207.    On information and belief, in furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including Grand Medical Supply, New Capital Supply, Utopia Equipment, Royal Medical Supply, Queens Medical Supply and GNK Medical Supply routinely submitted fraudulent bills for shoulder supports using code L3670 and/or L3660, which require fitting and adjustment and/or code M1007, which is not recognized in the Fee Schedule. By way of example and not limitation, Exhibit "32" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for shoulder

supports.

208. On information and belief, by billing shoulder supports under codes L3670 and/or L3660, the Retail Owners, through their respective Retailers, including Grand Medical Supply, New Capital Supply, Utopia Equipment, Royal Medical Supply, and GNK Medical Supply falsely represented that they fitted and/or adjusted the DME and/or orthotic device provided to the No-fault Claimant, when they did not.

209. Under the relevant Fee Schedule in existence at the time, the permissible charge for a basic, wrist support is $6.99 under code L3909 for a prefabricated item that includes a fitting and adjustment.

210. On information and belief, the Retail Owners, through their respective Retailers, including Queens Medical Supply, GNK Medical ,Supply, New Capital Supply, Royal Medical Supply and Utopia Equipment, routinely submitted bills to Plaintiffs seeking reimbursement for wrist supports under code L3908 and/or L3914 in amounts in excess of $65.00. By way of example and not limitation, Exhibit "33" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for wrist supports using code L3908 and/or L3914.

211. On information and belief, to the extent any DME and/or orthotic devices was provided, the Retail Owners, through their respective Retailers, including Queens Medical Supply, GNK Medical Supply, New Capital Supply, Royal Medical Supply, Utopia Equipment and Grand Medical Supply provided cheap, elastic, one-size-fits-all wrist supports, for which no fitting and/or adjustment was ever performed. By way of example, and not limitation, Exhibit "34" in the accompanying Compendium of Exhibits is a representative sample of claims where one or more of the Retailers fraudulently billed for wrist supports where no fitting and/or

adjustment was performed.

212.    On information and belief, by billing shoulder supports under codes L3908 and/or L3914, the Retail Owners, through their respective Retailers, including Queens Medical Supply and GNK Medical Supply falsely represented that they fitted and/or adjusted the DME and/or orthotic device provided to the No-fault Claimant, when they did not.

213.    Under the relevant Fee Schedule in existence at the time, the permissible charges for elbow supports range from $8.99 under code L3701, for basic, prefabricated supports, to $221.18 under code L3702 for more complex supports, which include a fitting and/or adjustment.

214.    On information and belief, the permissible charge for elbow supports billed under code L3700, which requires a fitting and adjustment, is $48.00. Notwithstanding the foregoing, on information and belief, in connection with claim 000123274870, the Retail Owners, through their respective Retailers, including GNK Medical Supply, submitted bills to Plaintiffs seeking reimbursement for elbow supports under code L3700 in the amount of $67.50, above the permissible charge set forth in the Fee Schedule.

215.    On information and belief, in other instances, the Retail Owners, through their respective Retailers including Parsons Medical Supply, Jamaica Medical Supply and Grand Medical Supply routinely submitted bills to Plaintiffs seeking reimbursement for elbow supports under code L3710, which requires fitting and adjustment, in amounts in excess of $65.00. By way of example and not limitation, in connection with claim 000153628029-04, Retailer Parsons Medical Supply submitted a fraudulent bill for elbow supports using code L3710. By way of further example and not limitation, in connection with claims 000108531070-01 and 000116428640-01, Retailer Grand Medical Supply submitted fraudulent bills for elbow supports

using code L3710. By way of further example and not limitation, in connection with claim 000140380320-02, Retailer Jamaica Medical Supply submitted a fraudulent bill for elbow supports using code L3710.

216. On information and belief, to the extent any DME and/or orthotic device was provided, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply and Grand Medical Supply provided cheap, elastic, one-size-fits-all elbow supports, for which no fitting and/or adjustment was ever performed.

217. On information and belief, by billing elbow supports under codes L3700 and/or L3710, the Retail Owners, through their respective Retailers, including GNK Medical Supply, Parsons Medical Supply, Jamaica Medical Supply and Grand Medical Supply falsely represented that they fitted and/or adjusted the DME and/or orthotic device provided to the No-fault Claimant, when they did not.

218. Under the relevant Fee Schedule in existence at the time, the permissible charges for ankle supports ranged from $8.09, under code L1901, for basic, prefabricated ankle supports that require a fitting and adjustment, to $690.00, under code L1950 for more complex items that were custom fabricated.

219. On information and belief, in furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for ankle braces, the Retail Owners, through their respective Retailers, including Utopia Equipment, Royal Medical Supply, New Capital Supply, and Grand Medical Supply routinely submitted fraudulent bills for ankle braces using code L1902 and/or L1905, despite the fact that the billed for item was never provided, not provided as billed, or provided pursuant to a predetermined course of treatment, irrespective of medical necessity and/or need.

Exhibit "35" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Defendants submitted fraudulent bills for ankle braces using code L1902 and/or L1905.

220. On information and belief, to the extent any DME and/or orthotic devices was provided, the Retail Owners, through their respective Retailers, including Utopia Equipment, Royal Medical Supply, New Capital Supply, and Grand Medical provided cheap, elastic, one-size-fits-all ankle braces, for which no fitting and/or adjustment was ever performed.

**2. Fraudulent Billing in Excess of the Fee Schedule**

221. On information and belief, in contravention of Regulation 83 which provides that the maximum permissible charge for DME is the fee payable for such equipment under the New York State Medicaid program at the time the equipment is provided, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, GNK Medical Supply and AVR Medical Supply routinely billed for dollar amounts greater than the dollar amounts set forth in the Fee Schedule. By way of example and not limitation:

- On information and belief, in connection with claim 0109380584, Defendant Aminova, through Parsons Medical Supply, submitted bills to Plaintiffs for canes using code E0100 in the amount of $47.00, when based on the Fee Schedule, DME provided under that code is only reimbursable in the amount of $12.00.

- On information and belief, in connection with claim 0123274870, Defendant M. Khaimov, through Jamaica Medical Supply, submitted bills to Plaintiffs for elbow supports using code E3700 in the amount of $67.50, when based on the Fee Schedule, DME provided under that code is only reimbursable in the amount of $48.00.

- On information and belief, in connection with claim 0137105144, Defendant Aminov, through GNK Medical Supply and Highlawn Best Medical Supply, submitted bills to Plaintiffs for cervical collars, using code L0120 in the amount of $27.77, when based on the Fee Schedule, DME provided under that code is only reimbursable in the amount of $6.80.

- On information and belief, in connection with claim 0158095405,

> Defendants Terdjanian and Vovk, through AVR Medical Supply, submitted bills to Plaintiffs for lumbar cushions, using code E0190 in the amount of $49.00, when based on the Fee Schedule, DME provided under that code is only reimbursable in that amount of $22.04.

222. On information and belief, by way of further example and not limitation, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply routinely submitted fraudulent bills to Plaintiffs for cervical traction units either as a Non-Fee Schedule or Fee Schedule item.

223. Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical traction units range from $21.36, under code E0860, for basic units that are hung over the door, to $502.63 under code E0855, for more complex units.

224. On information and belief, the cervical traction units purportedly provided by the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply are inexpensive replicas or knockoffs of a trademarked cervical traction unit manufactured and sold by Posture Pump, with a wholesale price that is a fraction of the cost associated with the authentic device. By way of example and not limitation, Exhibit "36" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted fraudulent bills for a cervical traction device.

225. On information and belief, the legitimate wholesale cost for a Posture Pump unit does not exceed $65.00, meaning that the maximum reimbursement for that item, if provided, and if it were a Non-Fee Schedule item, would be no more than $97.50.

226.    With respect to billing cervical traction units as Non-Fee Schedule items, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply submitted bills to Plaintiffs for cervical traction units for amounts ranging from $375.00 to over $700.00, in which they fraudulently represented that the lesser of their acquisition cost, plus 50% or the usual and customary price charged to the general public for the cervical traction units is approximately between $257.00 and $503.00, when the most that they could have legitimately paid as their acquisition costs would have been $65.00, and therefore subject to a maximum reimbursement of $97.50 if they had provided a cervical traction unit trademarked and manufactured by Posture Pump, or comparable device, which they did not.  By way of example and not limitation, Exhibit "37" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where one or more of the Retailers fraudulently billed for a cervical traction unit as a Non-Fee Schedule item.

227.    On information and belief, by submitting bills for cervical traction units as Non-Fee Schedule items in which they misrepresented their acquisition costs, the Retail Owners, through their respective Retailers, including LaPerla Supply, Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply, sought to maximize their reimbursement by deliberately deceiving Plaintiffs into paying three to seven times the maximum reimbursement rate permitted under Regulation 83 for such Non-Fee Schedule items.

228.    With respect to billing cervical traction units as Fee Schedule items, the Retail

Owners, through their respective Retailers, including New Capital Supply, Royal Medical Supply, Utopia Equipment and Highlawn Best Medical Supply submitted bills for complex cervical traction units using code E0855 at the maximum reimbursement rate of $502.63, when to the extent anything was provided, these Retailers purportedly provided cervical traction units with pumps, which are Non-Fee Schedule items, reimbursable, if at all, in accordance with the allegation set forth in paragraph 226 above. By way of example and not limitation, Exhibit "38" in the accompanying Compendium of Exhibits is a representative sample of claims fraudulently billed by the foregoing Retailers.

229. On information and belief, irrespective of whether the Retailers submitted bills for the cervical traction units as a Non-Fee Schedule or Fee Schedule item, to the extent anything was provided, the Retailers provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, irrespective of medical necessity and/or need.

230. On information and belief, in addition to billing for cervical traction units, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers including Jamaica Medical Supply, LaPerla Supply, New Capital Supply, Parsons Medical Supply and Queens Medical Supply, routinely submitted bills to Plaintiffs for head halters, using code E0942 or E0945, in amounts ranging from $25.00 to $51.00, when, to the extent such item was even provided, it was an accessory included with the cervical traction unit, and not a separate reimbursable item. By way of example and not limitation, Exhibit "39" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers fraudulently billed for a head halter in addition to a cervical traction unit.

3.     **Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

231.     On information and belief, in furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.  By way of example and not limitation, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for cervical collars under code L0172 in amounts in excess of $70.00.  Exhibit "40" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills for cervical collars under code L0172 in amounts in excess of $70.00.

232.     Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic flexible, foam collars, to $75.00 for semi-rigid, thermoplastic two-piece collars.

233.     On information and belief, to the extent any DME and/or orthotic device was provided, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply provided cervical collars that were not semi-rigid, thermoplastic two-piece collars but inexpensive items for which the legitimate wholesale cost did

not exceed $10.00.

234.    On information and belief, by billing cervical collars under code L0172, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply falsely represented that they provided semi-rigid, thermoplastic two-piece collars, when they did not.

235.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply submitted bills to Plaintiffs seeking reimbursement for lumbar cushions, using code E2611 in excess of $280.00. Exhibit "41" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills to Plaintiffs seeking reimbursement for lumbar cushions, using code E2611 in amounts in excess of $280.00.

236.    Under the relevant Fee Schedule in existence at the time, code E2611 is reserved for DME satisfying the description of "General Use W/C Back Cushion" and specifically reserved for lumbar support used in connection with a wheel chair.

237.    On information and belief, the Retailers did not provide to any No-fault Claimant a lumbar cushion used in connection with a wheelchair.

238.    On information and belief, none of the No-fault Claimants that received a lumbar cushion from one or more of the Retailers was wheelchair bound.

239.    On information and belief, to the extent any DME and/or orthotic device was

provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

240. On information and belief, by billing lumbar cushions under code E2611, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply and New Capital Supply falsely represented that they provided specialized wheelchair cushions, when they did not.

241. By way of further example and not limitation, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply routinely submitted bills to Plaintiffs for thermophores using codes E0215, E0210 and/or Z2304, the latter of which is not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $20.00 to $100.00. Exhibit "42" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs where the foregoing Retailers submitted bills for thermophores.

242. Under the relevant Fee Schedule in existence at the time, code E0215 is reserved for electric heat pads with a maximum permissible charge of $20.93.

243. On information and belief, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply did not provide electric heat pads to any No-fault Claimant.

244.    On information and belief, by billing lumbar cushions under code E0215, the Retail Owners, through their respective Retailers, including Parsons Medical Supply, Jamaica Medical Supply, Queens Medical Supply, Grand Medical Supply, Royal Medical Supply, Utopia Equipment, GNK Medical Supply, Highlawn Best Medical Supply, New Capital Supply and AVR Medical Supply falsely represented that they provided electric heat pads, when they did not.

## MONEY LAUNDERING SCHEME

245.    On information and belief, Defendants knew that the money paid by insurers, in general, and Plaintiffs, in particular, to the Retailers represented the proceeds and profits of their unlawful activity. On information and belief, to ensure that they would ultimately receive their ill-gotten gains, the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

246.    On information and belief, the Retailers and Wholesale Defendants generated significant amounts of cash through transactions with check cashers. Generating and using cash were necessary to facilitate: secret cash kickback arrangements between the Retailers and Wholesale Defendants, which were essential to foster the illusion that the Retailers actually paid the amounts reflected on the wholesale invoices for the DME and/or orthotic devices; secret cash kickback arrangements between the Retailers and No-fault Clinics, which were necessary to induce the clinics to supply the Retailers with prescriptions for bogus DME and/or orthotic devices; and transactions intentionally disguised as business expenses, but intended to enable the Retailers and Wholesalers to evade their corporate tax liabilities through false deductions and to evade their personal tax liabilities by providing them with large amounts of unreported cash thereby maximizing their profits from the scheme to defraud and enhancing their incentives to

continue the fraudulent activities described herein.

247. On information and belief, Defendants presented numerous checks to check cashers that were structured in amounts slightly under the $10,000; payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or presented by "brokers" who acted as intermediaries between the check cashers and the Retailers and Wholesale Defendants in order to conceal the true beneficiaries of the transactions.

248. On information and belief, in exchange for a nominal fee, all of the cash generated by the check cashing transactions involving the Wholesale Defendants was returned to the Retailers. In particular, in furtherance of the scheme to defraud, to create the illusion that the Retailers paid the grossly inflated prices on the invoices provided by the Wholesale Defendants, the Retailers issued checks to the Wholesale Defendants, among others, for the full amounts reflected on the wholesale invoice(s). The Retailers used those checks to demonstrate to Plaintiffs, and others, that they paid the false wholesale invoice amounts.

249. In reality, on information and belief, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned cash to the Retailers up to 90% of the wholesale invoice amounts.

250. On information and belief, these covert cash transactions were facilitated through various clandestine arrangements among the Retailers, Wholesale Defendants, check brokers and check cashers.

251. On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which would in turn be used, for among other things, to pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices

and back to the Wholesale Defendants in exchange for inflated wholesale invoices, maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

252.    On information and belief, to induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example, and not limitation:

- The Retail Owners, through their respective Retailers, routinely, and deliberately: (1) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that the Retailers actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size, and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (2) submitted fraudulent wholesale invoices from one ore more of the Wholesale Defendants, reflecting prices far in excess of those actually paid by the Retailers to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, the Retail Owners, through their respective Retailers, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- The Retail Owners, through their respective Retailers, submitted false delivery receipts in support of their bills that purport to demonstrate the No-fault Claimant's acknowledged receipt of the DME and/or orthotic devices, when in actuality the delivery receipts are routinely signed by the No-fault Claimants in blank and/or oftentimes, contain forged signatures;

- The Retail Owners, through their respective Retailers, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices provided (i.e. make and model) and/or additional information that is necessary to determine whether the charges submitted by the Retailers are legitimate.

253.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions, and acts of fraudulent

concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $ 2,100,000.00 based upon the fraudulent bill submissions.

254.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before they filed this Complaint.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

### AGAINST AMNER KHAIMOV (A. KHAIMOV), ABC CORPORATIONS 1 THROUGH 20  AND JOHN DOES 5 through 20

### (RICO, pursuant to 18 U.S.C § 1962(c))

255.    The allegations of paragraphs 1 through 254 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

256.    At all times relevant herein, LaPerla Supply was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

257.    From in or about 2003 through the date of the filing of this Complaint, Defendants A. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 5 through 20 knowingly conducted and participated in the affairs of the LaPerla Supply enterprise through a pattern of racketeering activity, including the many hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix and the exhibits annexed to this complaint, all of which are